HELEN V. CROCKER, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 33780, 36205, 39152, 43464, 46729–46731, 46743, 47213, 48656, 48739, 49169, 53938, 55708.

Promulgated January 17, 1934.

*Herman Phleger, Esq.*, and *T. R. Meyer, Esq.*, for the petitioners. *Alva C. Baird, Esq.*, for the respondent.

OPINION.

MARQUETTE: These proceedings were consolidated for hearing. The respondent has determined the following deficiencies in income tax:

| Petitioner | Docket No. | Year | Deficiency | Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|---|---|---|---|
| William H. Crocker | 47213 | 1924 | $31,724.97 | Ethel W. Crocker | 39152 | 1924 | |
| Do | 47213 | 1925 | 5,633.11 | Do | 39152 | 1925 | $3,532.60 |
| William W. Crocker | 46743 | 1924 | 5,618.97 | Do | 48739 | 1926 | 3,608.87 |
| Do | 46743 | 1925 | 5,258.80 | Ethel Mary de Limur | 43464 | 1925 | 3,230.13 |
| Do | 48656 | 1926 | 4,393.91 | Do | 46730 | 1926 | 3,508.44 |
| Charles Crocker | 36205 | 1924 | 3,817.93 | Do | 49169 | 1927 | 3,532.62 |
| Do | 36205 | 1925 | 3,313.23 | Helen Crocker Russell | 46729 | 1926 | 3,577.64 |
| Do | 46731 | 1926 | 3,532.60 | Do | 55708 | 1927 | 5,633.72 |
| Do | 53938 | 1927 | 3,532.60 | Do | 55708 | 1928 | |
| | | | | Helen V. Crocker | 33780 | 1925 | 8,283.30 |

The deficiencies for 1924 against the petitioners William H. Crocker and William W. Crocker are not contested. Since the re-

[1] Proceedings of the following petitioners are consolidated herewith: William H. Crocker; William W. Crocker; Charles Crocker; Ethel W. Crocker; Ethel Mary de Limur; and Helen Crocker Russell.

spondent has determined no deficiencies against petitioner Ethel W. Crocker for 1924 and petitioner Helen Crocker Russell for 1928, we do not have jurisdiction to determine the deficiencies against these petitioners for these years.

These proceedings were submitted on the pleadings and on the following stipulation:

1. UNIVERSAL CONSOLIDATED OIL COMPANY was incorporated under the laws of the State of California on May 9, 1922, with an authorized capital stock of Ten Million Dollars ($10,000,000), divided into ten million (10,00,000) shares of the par value of One Dollar ($1) each.

2. UNIVERSAL OIL COMPANY was incorporated under the laws of the State of California on April 27, 1911, and on May 9, 1922, it had outstanding six hundred thousand (600,000) shares of capital stock of the par value of Ten Dollars ($10) per share. Its business consisted in owning and leasing oil properties and mining thereon for oil.

3. DEVILS DEN CONSOLIDATED OIL COMPANY was incorporated under the laws of the State of California on February 2, 1900, and on May 9, 1922, it had outstanding seventy-three thousand seven hundred sixty-two (73,762) shares of the par value of Ten Dollars ($10) per share. Its business consisted in owning and leasing oil properties and mining thereon for oil.

4. Under date of May 9, 1922, Universal Consolidated Oil Company—

(a) Acquired all of the business and assets and assumed all of the liabilities of Universal Oil Company by issuing to Universal Oil Company in payment therefor two million three hundred fifty-seven thousand eight hundred eighty-four (2,357,884) shares of the capital stock of Universal Consolidated Oil Company; and

(b) Acquired all of the business and assets and assumed all of the liabilities of Devils Den Consolidated Oil Company by issuing to Devils Den Consolidated Oil Company eight hundred eleven thousand three hundred eighty-two (811,382) shares of the capital stock of Universal Consolidated Oil Company.

5. The opening entries on the books of Universal Consolidated Oil Company showed:

Capital stock _____ $3,169,266

this being the aggregate par value of shares issued to Universal Oil Company and Devils Den Consolidated Oil Company in payment for their assets (subject to their liabilities). On December 31, 1923, a surplus of One Hundred Seventy-three Thousand Eight Hundred Seventy-three and 11/100th Dollars ($173,873.11) was recorded on the books as of May 9, 1922, as the result of a revaluation of certain properties. Said surplus constituted the only surplus recorded on the books of the new company as of the last named date. The only shares in addition to the above which were issued by Universal Consolidated Oil Company, at or prior to the acquisition of the properties and assets of the Universal Oil Company and Devils Den Consolidated Oil Company, were nine hundred (900) shares, being one hundred (100) shares issued to each of the nine (9) incorporators of the company at par for cash.

6. SAUER DOUGH OIL COMPANY was incorporated under the laws of the State of California. On September 29, 1922, it had in its treasury five hundred fifty-eight thousand one hundred seventy-three (558,173) shares of the capital stock of Universal Consolidated Oil Company, which constituted substantially all its assets. On that date Universal Consolidated Oil Company offered to exchange 1.42 of its shares for each share of Sauer Dough Oil Company outstanding. As a result of this offer Universal Consolidated Oil Company issued five hun-

dred sixty-one thousand three hundred ninety-seven (561,397) shares of its stock to stockholders of Sauer Dough Oil Company in exchange for their stock in Sauer Dough Oil Company, and later took over the assets of Sauer Dough Oil Company which consisted of stock of Universal Consolidated Oil Company.

7. The predecessor companies had an undistributed surplus as of May 9, 1922, and earned since March 1, 1913, of an amount in excess of all dividends paid by the Universal Consolidated Oil Company from the time of its organization (May 9, 1922) to and including December 31, 1927.

8. Charles Crocker received dividends from Universal Consolidated Oil Company during the year 1924 amounting to Seventeen Thousand Six Hundred Sixty-three and 4/100th Dollars ($17,663.04) and no more, and said Charles Crocker returned all of said dividends in his income tax return for the year 1924, and paid income tax thereon.

9. The following named petitioners received dividends or distributions from Universal Consolidated Oil Company during the following years, in the following amounts, and no more, and returned and paid income tax on the following amounts out of said dividends, and no more:

| Docket No. | Name | Year | Dividends received | Dividends returned | Dividends not returned |
|---|---|---|---|---|---|
| 36205 | Charles Crocker | 1925 | $17,663.04 | $662.36 | $17,000.68 |
| 33780 | Helen V. Crocker | 1925 | 17,663.04 | 662.36 | 17,000.68 |
| 43464 | Ethel Mary de Limur | 1925 | 17,663.04 | 662.36 | 17,000.68 |
| 39152 | Ethel W. Crocker | 1925 | 17,663.04 | 662.38 | 17,000.66 |
| 47213 | William H. Crocker | 1925 | 22,037.68 | 826.42 | 21,211.26 |
| 46743 | William W. Crocker | 1925 | 18,103.04 | 678.86 | 17,424.18 |
| 53938 | Charles Crocker | 1927 | 17,663.04 | None | 17,663.04 |
| 55708 | Helen Crocker Russell | 1927 | 17,663.04 | None | 17,663.04 |

10. For the purpose of determining the taxability of dividends or distributions made by Universal Consolidated Oil Company during the years 1925, 1926 and 1927, it is stipulated that said corporation, since its incorporation on May 9, 1922, has had earnings or profits available for dividends, or losses, and has paid dividends or made distributions as follows:

| | Earnings | Losses | Dividends or distributions |
|---|---|---|---|
| May 9,–Dec. 31, 1922 | $107,879.76 | | |
| 1923 | 207,271.81 | | |
| 1924 | 48,106.28 | | $255,725.60 |
| 1925 | 66,301.95 | | 267,725.60 |
| 1926 | 176,353.33 | | 271,725.60 |
| 1927 | | Loss sustained in undetermined amount | 286,483.04 |

provided, however, that the earnings above set forth should be reduced by the following amounts:

May 9, 1922, to Dec. 31, 1922_____ $3,072.35
1923_____ 25,891.39
1924_____ 5,461.66

if the court shall determine that the said amounts were not available for the payment of dividends under the following state of facts, which are hereby stipulated to:

During the year 1923 Universal Consolidated Oil Company paid the sum of Thirteen Thousand Three Hundred Ninety and 12/100th Dollars ($13,390.12) on account of income taxes for the period from May 9, 1922 to December 31, 1922. During the year 1924 Universal Consolidated Oil Company paid the sum of

Twenty-eight Thousand Six Hundred Seven and 83/100th Dollars ($28,607.83) on account of income taxes for the year 1923. During the year 1925 Universal Consolidated Oil Company paid the sum of Five Thousand Four Hundred Sixty-one and 66/100th Dollars ($5,461.66) on account of income taxes for the year 1924. By a letter addressed by the Bureau of Internal Revenue to said Universal Consolidated Oil Company under date of July 16, 1931, the Bureau of Internal Revenue determined that said Universal Consolidated Oil Company had made an overpayment of income taxes for the period from May 9, 1922 to December 31, 1922 amounting to Three Thousand Seventy-two and 35/100th Dollars ($3,072.35), and that Universal Consolidated Oil Company had made an overpayment of income taxes for the year 1923 amounting to Twenty-five Thousand Eight Hundred Ninety-one and 39/100th Dollars ($25,891.39). By Certificate of Overassessment No. 1097547, addressed by the Bureau of Internal Revenue to said Universal Consolidated Oil Company during the year 1928, the Bureau of Internal Revenue determined that said Universal Consolidated Oil Company had made an overpayment of income taxes for the year 1924 amounting to Five Thousand Four Hundred Sixty-one and 66/100th Dollars ($5,461.66). Said overpayment of Three Thousand Seventy-two and 35/100th Dollars ($3,072.35) for the period from May 9, 1922 to December 31, 1922 was refunded to said Universal Consolidated Oil Company during the year 1931. Said overpayment of Twenty-five Thousand Eight Hundred Ninety-one and 39/100th Dollars ($25,891.39) for the year 1923 has never been refunded or credited to said Universal Consolidated Oil Company, and the time for filing of a claim for refund thereof has expired, and no claim for refund thereof or petition to the Board of Tax Appeals for the year 1923 has been filed by said Universal Consolidated Oil Company. Said overpayment of Five Thousand Four Hundred Sixty-one and 66/100th Dollars ($5,461.66) for the year 1924 was refunded to said Universal Consolidated Oil Company during the year 1928.

11. The facts and figures hereinabove set forth have been stipulated to solely for the purpose of disposition of the above-entitled appeals and for the taxable years involved therein, and shall not be binding upon any of the parties hereto and/or upon Universal Consolidated Oil Company in any other proceeding.

From the pleadings we find that, in addition to the amounts of dividends or distributions stipulated in paragraph 9 of the stipulation, the following petitioners received in the respective years dividends or distributions from the Universal Consolidated Oil Co., no part of which has been returned for income tax:

| Name of petitioner | Year | Distribution received |
|---|---|---|
| Charles Crocker | 1926 | $17,663.04 |
| Helen Crocker Russell | 1926 | 17,663.04 |
| Ethel Mary de Limur | 1926 | 17,663.04 |
| Do | 1927 | 17,663.04 |
| Ethel W. Crocker | 1926 | 17,663.04 |
| William W. Crocker | 1926 | 18,103.04 |

Each of the petitions alleges that the Universal Oil Co. and Devils Den Consolidated Oil Co. distributed to their stockholders the capital stock of the Universal Consolidated Oil Co. received by them as set forth in the stipulation. This allegation was denied by

certain of the answers and admitted in others. Counsel for respondent in its brief now admits its truth.

The only issue submitted to us for decision is whether all the dividends above set forth constitute taxable income. It is stipulated that the predecessor companies had as of May 9, 1922, an undistributed surplus earned since March 1, 1913, in an amount in excess of all the dividends paid by the Universal Consolidated Oil Co. from its organization to and including December 31, 1927. The petitioners contend that the Universal was a new corporation, distinct from its predecessors, with the result that what was a surplus to the old corporations was capital to the new, or, to put it otherwise, that the distributions here involved, except to the extent that they included earnings made by Universal itself, did not constitute dividends as that term is defined in section 201 (a) of the Revenue Acts of 1921, 1924, and 1926.

The petitioners rely on *Irving S. Robeson*, 18 B.T.A. 323. Since the decision in that case, the Circuit Court of Appeals for the Second Circuit has decided *Commissioner* v. *Sansome*, 60 Fed. (2d) 931, and the Circuit Court of Appeals for the Ninth Circuit has decided *United States* v. *Kauffmann*, 62 Fed. (2d) 1045. These cases hold that, where there has been a reorganization in which the stockholders of an old company have received stock in the new corporation in exchange for their stock in the old, and where under the Revenue Act of 1921 the transaction was tax-free, the earnings of the old corporation continue to be earnings in the hands of the new, the distribution of which constitutes a taxable dividend. It is true that in the above cases there was only one predecessor corporation, while here there were three. It is also true that it is merely stipulated that the surplus of the three was sufficient to pay the dividends so that it may be that one of them had a deficit. If so, petitioners have failed to this extent in their proof. But we do not think that such a fact, even if true, makes any difference. If the successor corporation had a surplus inherited from all its predecessors sufficient to pay the dividends, it matters not in what proportions it was contributed. Such is the effect of our decision in *George F. Baker, Jr., Executor*, 28 B.T.A. 704. In the latter case the available earnings, the distribution of which by the successor corporation we held to constitute a taxable dividend, were composed largely of earnings of five predecessor corporations which varied greatly in amount. On the authority of the above cases we approve the ruling of the respondent. Having reached this conclusion, we find it unnecessary to decide the question raised by paragraph 10 of the stipulation.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK, McMAHON, and GOODRICH dissent.

LANSDON, dissenting: I am unable to agree with conclusion of the majority in this proceeding. In my opinion its effect is to impose a tax not authorized by Congress. It seems to me not only to ignore plain statutory provisions applicable to the precise situation here, but to substitute a rule therefor by construction and interpretation which plainly contravenes the constitutional provisions that all taxes must be levied by the Congress. There is, of course, no possible question that as to the new corporation all the assets of the old companies became its capital when acquired for stock on May 9, 1922.

The term capital means not the capital stock, but the actual property or estate of the corporation, whether in money or property. In *People* v. *Commissioner of Taxes and Assessments for City and County of New York*, 23 N.Y. 172, the court said, " it [capital] is the aggregate of the sum subscribed and paid in, or secured to be paid in by its shareholders, with the addition of all gains or profits realized in the use or in investment of those sums, or if losses have been incurred then it is the residue after deducting such losses." Again, in *Smith* v. *Dana*, 77 Conn. 543; 60 Atl. 117; it was held that " The capital of the corporation is the money furnished by subscribers or promoters of the corporation to be used by it in its business or undertakings, citing *American Life Ins. Co.* v. *Ferguson*, 66 Ore. 417; 134 Pac. 1029. In *Christiansen* v. *Eno*, 106 N.Y. 97; 12 N.E. 648, the court said: " The capital of a corporation consists of its funds, securities, credits and property of whatever kind which it possesses." It is perfectly clear that all the property which a corporation acquires by the issue of stock or by profits from operation is its capital.

When the Consolidated issued its stock for assets of three prior corporations the property so acquired became its capital, but for some reason not disclosed by the record it distributed certain amounts thereof (not in partial or complete liquidation) not only to the shareholders of the predecessor corporation, but ratably to all its stockholders. Under the laws of California, California Civil Code, sec. 309, such distributions are not dividends and may be made only with the permission of the commissioner of corporations of that state. *Martin Zellerbach*, 38 Cal. 300. In section 201 (d)[1] of the Revenue Acts of 1924 and 1926, which are applicable here,

---

[1] SEC. 201. (d) If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 204, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. The provisions of this paragraph shall also apply to distributions from depletion reserves based on the discovery value of mines.

Congress has specifically provided for the taxation of such distributions.

The real facts here are that at date of its organization Consolidated acquired certain assets theretofore the property of the other corporations, by the issue of its stock therefor. At such date its books showed capital in the amount of the values obtained for its capital stock and indicated neithed earned nor paid-in surplus except a relatively small amount resulting from the write-up in value of certain assets it acquired. It was a new corporation in which the persons who had owned all the stock and controlled all the operations of the Universal Oil Co., the Devils Den Consolidated Oil Co. and the Sauer Dough Oil Co. held little more than one third of the authorized stock and in which the stockholders of none of the prior corporations owned more than one fourth of the authorized capital of the new corporation and only one held a majority of the new stock when issued. In these circumstances their rights as minority interests were far different from their position as sole owners of the stock of the old companies. *Marr* v. *United States*, 236 U.S. 53. It is obvious, therefore, that the determinations of the Commissioner wholly ignored corporate entities in which the rights of the respective shareholders were substantially different.

Disregard of corporate entities sometimes may be necessary in a practical adjustment of tax liabilities, but it is proper only when it is impossible otherwise to reach a practical result reflecting true tax liability. This is usually when there has been no real change in corporate or economic identity, where the corporation is a one-man concern or closely held by members of the same family, *Search Light Home Co.* v. *American Graphophone*, 240 Fed. 745, where it is necessary to protect the public interest or where there is fraud. In *United States* v. *Milwaukee Refrigerating Transit Co.*, 142 Fed. 247, the court said:

> If any general rule can be laid down in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule and until sufficient reasons to the contrary appears; but when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud or defend crime, the law will regard the corporation as an association of persons; and, where one corporation is organized and owned by the officers and stockholders of another making their interests identical, they may be treated as identical when the interest of justice requires it.

In the present proceeding there is no charge of fraud and the public interest is adequately protected by statutory provisions for the ultimate taxation of any income included in the distributions in question. In my opinion there is no occasion to disregard the doctrine of separate corporate entities.

I am not unmindful that respondent relies on the opinions of the United States Circuit Court of Appeals in the Second and Ninth Circuits in *Commissioner* v. *Sansome*, 60 Fed. (2d) 931, and *United States* v. *Kauffmann*, 62 Fed. (2d) 1045, and our decision in *George F. Baker, Jr., Executor*, 28 B.T.A. 704. The first two cases cited are undistinguishable from each other as to facts. The *Kauffmann* case was decided solely on the authority of *Sansome*, with only a brief discussion of underlying legal principles and consequences. It is not necessary, therefore, to discuss it specifically in connection with the present proceedings. In the *Sansome* case the reorganization consisted only of a slight change of name and of the issue of five shares of stock of the successor for each share of the predecessor. There was no change in legal identity that resulted in new rights or obligations of the stockholders. All of the stock of the prior and successor corporations was owned by the same persons and in exactly the same proportions. The books of account of the old corporation were continued by the new without change and the surplus of the old appeared as such therein. The opinion of the circuit court might well have been based on the single proposition that there had been no actual change from an old to a new corporate entity, and that conclusion finds ample support in *Marr* v. *United States, supra*. Notwithstanding his conclusion that the reorganization in the *Sansome* case effected no change in legal form sufficient to create a new taxable entity, the learned judge proceeded further to discuss the case on what he regards as broad statutory grounds and it is this discussion that it is alleged is applicable here. He suggests that section 202 (c) (2) of the Revenue Act of 1921 [2] should be read as a mere gloss of section 201 and then concludes, apparently by ignoring section 201 (c),[3] that Congress could not have intended that taxation of a distributed surplus of an old corporation merged into a new should await some future event. In my opinion there is no necessity for construction or interpretation of the statutory provisions here involved. The general rule is that where the language of a statute is clear and unambiguous, it shall be applied literally.

[2] SEC. 202. (c) (2) When in the reorganization of one or more corporations a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization. The word "reorganization" as used in this paragraph, includes a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or of substantially all the properties of another corporation), recapitalization, or mere change in identity, form, or place of organization of a corporation, (however effected).

[3] SEC. 201. (c) Any distribution (whether in cash or other property) made by a corporation to its shareholders or members otherwise than out of (1) earnings or profits accumulated since February 28, 1913, or (2) earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, shall be applied against and reduce the basis provided in section 202 for the purpose of ascertaining the gain derived or the loss sustained from the sale or other disposition of the stock or shares by the distributee.

In *United States* v. *Merriam*, 263 U.S. 179, the Supreme Court said:

On behalf of the government it is urged that taxation is a practical matter and concerns itself with the substance of the thing upon which the tax is imposed rather than with the legal forms or expressions. But in statutes levying taxes the literal meaning of the words employed is most important for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer. [Citing *Gould* v. *United States*, 245 U.S. 151.]

In English jurisprudence, from which many of the principles governing American taxation have been derived, the rule set out by the Supreme Court has long been observed. In *Partington* v. *Attorney General*, L.R. 4 N.L. 100, 122, Lord Cairns said:

I am not at all sure that in a case of this kind—a fiscal case—form is not amply sufficient; because as I understand the principle of all fiscal legislation it is this: If the person sought to be taxed comes within the letter of the law, he must be taxed, however great the hardship may appear to the judicial mind to be. On the other hand, if the crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the law the case might otherwise appear to be. In other words, if there be admissible in any statute what is called an equitable construction, certainly such construction is not admissible in a taxing statute, where you can simply adhere to the words of the statute.

The very situation which the learned judge would deal with by interpretation and construal is provided for literally in section 201 (c) of the Act of 1921, *supra*, which is somewhat enlarged and greatly clarified in identical sections 201 (d) of the Revenue Acts of 1924 and 1926. In both acts Congress provided that when distributions are not made out of earnings or profits accumulated after March 1, 1913, the amount thereof shall be applied against and reduce the basis of the stock as set out in section 204 of such acts and if in excess of such basis, such excess shall be taxable as a gain from the exchange of property, and adds further that such provisions shall also apply to the distribution of depletion reserves based on the discovery value of mines.

All the above pertinent provisions read together clearly indicate that Congress considered the exact situation here. There is direct recognition that a corporation may make the sort of distribution under review, and when so made taxation at both normal and surtax rates will follow the part thereof in excess of capital invested in stock into the hands of the distributees. There is no surrender of the right to tax income and the privilege of postponement is penalized by the addition of normal taxes when the whole amount is finally realized through distribution. In my opinion Congress has recognized all possible contingencies resulting from distributions not

out of earnings or profits accumulated by a corporation after March 1, 1913, but even if there has been an omission, neither administrative nor judicial procedure can amend or add to an act of Congress by interpretation or construal. It should also be borne in mind that these proceedings are governed by the Revenue Acts of 1924 and 1926, which, as to the provisions applicable here, are different from those of the Revenue Act of 1921 that govern the *Sansome* case. It may well be, therefore, that the decisions upon which the respondent relies have no application to situations governed by later enactments and the entire opinion in that case may be applicable there without in any way affecting the controversy in this proceeding.

The respondent also relies upon our opinion in *George F. Baker, Jr., Executor, supra,* in which was cited with approval the decisions of the courts in the *Sansome* and *Kauffmann* cases. I think the facts in the *Baker* case also clearly distinguish it from the present proceedings. There, prior to the year 1900, the New Jersey General Security Co., the dividend-paying entity, acquired all the stock of five other corporations. Later it caused such five corporations to be merged into a single organization, the Passaic Consolidated Water Co., in which it owned all the capital stock. In the taxable year it distributed amounts appearing as surplus on the books of the five merged companies as dividends to its own stockholders. Here is a situation in which corporate identity may be ignored, since in substance there was only one business entity after the year 1900. All the corporations involved were chartered under the laws of New Jersey and at all times all the stock of the five merged companies, as well as that of their successor, was owned by the company which distributed the dividends upon which the respondent determined surtaxes to be due. In all essential facts there never was but one business entity after the year 1900, and that entity accumulated the distributed earnings after February 28, 1913. The situation, therefore, falls fairly within the circumstances of the *Sansome* and *Kauffmann* cases and the rule applied therein is applicable. Certainly the facts in the proceedings at bar are widely different. Here the old corporations did not cause the organization of the new concern, but sold their assets for stock and their stockholders potentially, at least, became minority interests in the new corporation, which from the first had stockholders not interested in the predecessor corporations and at the dates of distribution may have been completely controlled by new interests. In our opinion the rule followed in the *Baker* proceeding has no application here.

It is highly desirable that the statutory provisions for taxation and the administrative and judicial interpretations thereof shall be consistent and harmonious. Approval of the respondent's determination herein would be highly inconsistent with many of his

own regulations and with numerous decisions of the Board and the Courts. Net losses sustained by a corporation which loses it identity by merger or consolidation with a successor may not be applied to reduce the tax liability of the new taxable entity so created. In the *Maytag Co.*, 17 B.T.A. 182, where one corporation exchanged all its assets subject to liabilities for the common and preferred stock of a successor and distributed such stock to its shareholders, we held that a net loss sustained by the prior corporation could not be applied to reduce the tax liability of its successor in the succeeding taxable years because the successor was not the taxpayer that sustained the loss. In our opinion there we pointed out that the conclusion reached is consistent with other decisions of the Board involving questions of depreciation and invested capital. The rule established in *Maytag Co.* has since been applied in *Plumber's Supply Co.*, 20 B.T.A. 459; *Standard Silica Co.*, 22 B.T.A. 97; *Athol Mfg. Co.*, 22 B.T.A. 105; affd., 54 Fed. (2d) 230; *Clark Dredging Co.*, 23 B.T.A. 503; *Overbrook Nat. Bank of Philadelphia*, 23 B.T.A. 1390; *New Colonial Ice Co.*, 24 B.T.A. 886. In *West Point Marion Coal Co.*, 19 B.T.A. 945, in which the petitioner was denied the benefit of a net loss sustained by its predecessor in the prior year, we said:

The petitioner is not entitled to the deduction claimed under this section because it sustained no net loss in the year 1921. See *White House Milk Co.*, 2 B.T.A. 860. Its existence and the operation of any business by it from which a loss might have resulted did not begin until some time in 1922. See *Florida Grocery Co.*, 1 B.T.A. 412. This result is not altered by the identity of the petitioner's stockholders and the holders of the shares of the predecessor association. The petitioner corporation is a taxable entity separate and distinct from its stockholders and separate and distinct from its predecessor. See *E. C. Huffman*, 1 B.T.A. 52; *John K. Greenwood*, 1 B.T.A. 291, and cases there cited.

It is also well established that a corporation is not entitled to compute depletion on the basis of discovery value to a predecessor from which it has acquired assets by the issue of its stock. *Darby-Lynde Co.*, 20 B.T.A. 522; affd., 51 Fed. (2d) 32; *Rialto Mining Corp.*, 25 B.T.A. 980. Although invested capital is a highly artificial statutory concept in the Revenue Acts of 1917, 1918, and 1921, Congress expressly provided that all values acquired by the issue of the stock of a corporation should be regarded as capital at risk in business at their fair market value at date of acquisition, regardless of the amounts allowable to predecessors. *Regal Shoe Co.*, 1 B.T.A. 896; *Rosenbaum Brothers, Inc.*, 11 B.T.A. 736. We have also held that the basis for depreciation of assets acquired for stock is the fair market value at date of acquisition, regardless of cost to prior owners. *Monarch Electric & Wire Co.*, 12 B.T.A. 158. See also *American Printing Co.* v. *United States*, 53 Fed. 98. All the decisions and opinions cited in this connection recognize the sepa-

rate entity of prior and successor corporations and are based on the proposition that whatever a corporation receives at the time of its organization in exchange for its stock becomes then and there a part of capital structure at fair market values. Taken together they constitute a consistent and harmonious whole into which an affirmation of the respondent's determination in these proceedings would introduce a highly discordant element.

It is stipulated that the combined surplus of the three corporations that were merged into the Universal Consolidated Oil Co., taken with the earnings of such concern after its organization, was sufficient to pay all the dividends in controversy. We do not know the surplus of each of the prior concerns. One or two of them may have had an actual capital deficit at May 9, 1922. If so, the theory of the respondent would certainly result in distributions to stockholders of corporations with no earnings available therefor and so impose a tax on capital, to the extent of the amounts received by such stockholders, thus creating a situation not contemplated by either the statute or the Constitution. It is also stipulated that 900 shares of Consolidated stock were issued for cash at or prior to date of incorporation, but how many additional shares were sold for cash prior to the issue of any of the dividends is nowhere disclosed. Certainly the owners of the 900 shares who received their ratable portion of the distribution in question reaped when they had not sown, as did any others who may have purchased for cash before such distributions were made.

Upon the stipulated facts and in conformity with the reasons above set out, I think the amounts in controversy were dividends only to the extent that they were paid out of the earnings of the Universal Consolidated Oil Co. accumulated in its own operations after May 9, 1922. The excess over such earnings should first be applied against the stock basis as provided in section 204 of the Revenue Acts of 1924 and 1926, and the remainder, if any, taxed to the recipients as provided in section 201 (d) of the same acts. *Irving S. Robeson*, 18 B.T.A. 323.

TRAMMELL agrees with this dissent.