*Decision will be entered under Rule 50*

FREDERICK AYER, JR., ET AL., TRUSTEES UNDER INDENTURE OF TRUST EXECUTED BY FREDERICK AYER, DATED FEBRUARY 24, 1911, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67766. Promulgated April 26, 1938.

*Ralph E. Tibbetts, Esq.*, for the petitioners.
*George D. Brabson, Esq.*, for the respondent.

OPINION.

BLACK: The sole issue in this proceeding is whether petitioners are taxable on the $225,694.35 which was paid to them during the year 1929 from the depletion reserves of the Keweenaw Land Asso-

ciation, Ltd., and if not taxable on the entire amount, then on what part, if any, are they taxable. The pertinent sections of the Revenue Act of 1928 are printed in the margin.[1]

At the outset it should be noted that the last sentence of section 115 (d) is not applicable to the facts in this proceeding as the depletion reserves here involved were based upon the March 1, 1913, value rather than "on the discovery value of mines." It should also be noted that while section 115 (b) provides that any tax-free distribution shall reduce the basis, it does not provide, as in section 115 (d), that if in excess of such basis, the excess shall be taxable.

The principal deciding factor is the determination of what portion, if any, of the distribution of $225,694.35 represents an "increase in value of property accrued, before March 1, 1913" and what portion, if any, of the distribution falls within that group of "other distributions from capital" referred to in section 115 (d). The distribution in question was made after all the earnings and profits accumulated after February 28, 1913, and before March 1, 1913, had been distributed, and, therefore, under the plain provisions of the statute, if any part was from "increase in value of property accrued, before March 1, 1913", that part may be distributed "exempt from tax" even though it is in excess of the basis and, if any part was from "other

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\*        \*        \*        \*        \*

(b) *Source of distributions.*—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed except from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 113.

\*        \*        \*        \*        \*        \*        \*

(d) *Other distributions from capital.*—If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. The provisions of this subsection shall also apply to distributions from depletion reserves based on the discovery value of mines.

\*        \*        \*        \*        \*        \*        \*

SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property ; except    \*    \*    \*

SEC. 111. DETERMINATION OF AMOUNT OF GAIN OR LOSS.

(a) *Computation of gain or loss.*—Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in section 113, and the loss shall be the excess of such basis over the amount realized.

(b) *Adjustment of basis.*—In computing the amount of gain or loss under subsection (a)—

\*        \*        \*        \*        \*        \*        \*

(3) In the case of stock the basis shall be diminished by the amount of distributions previously made in respect of such stock, to the extent provided under the law applicable to the year in which the distribution was made.

\*        \*        \*        \*        \*        \*        \*

distributions from capital", that part "shall be applied against and reduce the basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property." See art. 626, Regulations 74.

Petitioners' principal contention is that the new association should be regarded in substance as a mere continuation of the old association with an investment of $40,000, and that since the distribution in question was paid out of depletion reserves based upon a March 1, 1913, value of $17,076,008.22, the entire distribution (or at least over 99 percent thereof) should be regarded as paid out of an "increase in value of property accrued, before March 1, 1913." As alternative propositions petitioners contend that, even if any part of the distribution be held as having been paid out of "other distributions from capital", then (1) only such distributions as were made during the effective period of the Revenue Act of 1928 may be applied against petitioners' basis of $1,017,915, and since during this period only $406,594.35 ($180,900 plus $225,694.35) was paid from depletion reserves, petitioners' basis would not be exceeded and they would not be taxable on any part of the distribution of $225,694.35; or (2) only such distributions as were made during the effective period of the Revenue Acts of 1924, 1926, and 1928 may be applied against petitioners' basis, and, since during this period there was paid from depletion reserves the amount of $938,623.05, the maximum portion of the distribution in question taxable as a capital net gain could not exceed the amount of $146,402.40; or (3) in any event if all distributions made between October 6, 1915, and December 31, 1928, were applied against petitioners' basis, the distribution in question could not exceed petitioners' basis by more than $224,726.98, and the respondent was at least in error to the extent that he included in petitioners' capital net gain any amount in excess of the maximum amount of $224,726.98. The respondent concedes petitioners' third alternative contention, but contends that his determination as to all other matters should be approved.

We shall first consider petitioners' principal contention. The old and new associations organized in 1891 and 1908, respectively, were what is known under the laws of the State of Michigan, as partnership associations. See Comp. Laws Mich., 1929, chs. 193 and 194, secs. 9909 to 9942. The act providing for such associations was first enacted in 1877. It has been amended and added to from time to time, and as amended is still in effect. The law governing corporations, rather than the law governing partnerships, is applicable to partnership associations. *Rouse, Hazard & Co.* v. *Donovan*, 111 Mich. 251; 62 N. W. 359; *Staver & Abbott Manufacturing Co.* v. *Blake*,

111 Mich. 282; 69 N. W. 508; *Armstrong* v. *Stearns*, 156 Mich. 604; 121 N. W. 312; *Yonkerman Co., Ltd.* v. *Fuller's Advertising Agency*, 135 Fed. 613. In the last mentioned case the court said:

Plaintiff is a partnership association organized under chapter 160, Comp. Laws Mich. 1897, Sections 6079 to 6089. Such associations are legal entities, and are quasi corporations, controlled by the law applicable to corporations rather than partnerships.

Section 1 of the law under which the two associations in question were organized (sec. 9909, Comp. Laws Mich., 1929), among other things, provided that "Said articles of association shall also state * * * the contemplated duration of said association, which shall not in any case exceed twenty years * * *." The Keweenaw Association, Ltd., was organized February 13, 1891. Under section 9909, *supra*, its life would have ended on February 13, 1911. Thereafter, under section 9916 of the Compiled Laws of Michigan, 1929, "said association shall cease to carry on its business, except so far as may be required for the beneficial winding up thereof." Cf. *Manhard Hardware Co.* v. *Rothschild*, 121 Mich. 657; 80 N. W. 707. it was not until 1919 that the State of Michigan permitted partnership associations to extend their life. See sec. 9940, Comp. Laws Mich., 1929.

What was the condition of the old association in the instant case in July 1908? It had less than three years yet to live. It was in the midst of a profitable business which could not be successfuly completed within that time. The laws of Michigan contained no provision under which its life could be extended. The members unanimously desired to carry on the business. While they could not extend the life of the old association, there was nothing to prohibit them from organizing a new association to take over the business of the old association, providing they unanimously agreed to do so, which was the case. Cf. *Attorney General* v. *Perkins*, 73 Mich. 303; 41 N. W. 426. The testimony shows that the reason for organizing the new association in 1908 rather than waiting until 1911 was that some of the members were getting along in years and they thought it advisable to make the change before the death of one or more of the members, which death might have complicated the intended action. Accordingly, the Keweenaw Land Association, Ltd., was duly organized on July 14, 1908, in the manner more fully set forth in our findings.

Petitioners, in support of their contention that the $40,000 capital of the old association remained the capital of the new association and represents the cost to it of the property taken over, and that any appreciation in the value of the assets of the old association which took place prior to October 12, 1908, represents "increase in value of

property accrued before March 1, 1913", within the meaning of section 115 (b) of the Revenue Act of 1928, to the new association, as well as appreciation which took place between October 12, 1908, and March 1, 1913, cites and relies upon *Commissioner* v. *Sansome*, 60 Fed. (2d) 931; *United States* v. *Kauffmann*, 62 Fed. (2d) 1045; *Helen V. Crocker*, 29 B. T. A. 773; *Geo. F. Baker, Jr., Executor*, 28 B: T. A. 704.

We do not think these cases are controlling upon the point we have here to decide. They held that, where there has been a tax-free statutory reorganization under the provisions of the revenue act applicable at the time the reorganization takes place, earnings of the predecessor corporation retain their character as accumulated earnings rather than becoming capital to the successor corporation in reorganization. For example the concluding part of the court's opinion in the *Sansome* case reads as follows: "Hence we hold that a corporate reorganization which results in no 'gain or loss' under Section 202 (c) does not toll the company's life as continued under Section 201, and that what were 'earnings or profits' of the original or subsidiary company remain for purposes of distribution 'earnings or profits' of the successor or parent, in liquidation."

To the same effect are *United States* v. *Kauffman, supra; Helen V. Crocker, supra,* and *Geo. F. Baker, Jr., Executor, supra.* There was no such reorganization statute in existence at the time the old association sold and transferred its property to the new association in October 1908. Hence we hold that the cases which petitioners cite and rely upon are not controlling.

In *Rosenbaum Brothers, Inc.,* 11 B. T. A. 736, the question was the determination of the petitioner's invested capital under section 326 (a) (2) of the Revenue Act of 1918, and the question turned on whether the petitioner was a new corporation organized in 1916 or merely a continuation of a corporation organized in 1890. The petitioner there was a corporation chartered under the laws of Illinois on February 24, 1916, to take over the business of a corporation by the same name that had been chartered under the laws of Illinois in 1890, but whose charter had expired by limitation on July 9, 1915. Through an oversight the officers of the old corporation did not become aware that the charter had expired until the following year, at which time they immediately secured a new charter for a term of 99 years. Between the date that the old charter expired and the new charter was secured, the business continued to operate and function in the same manner as it had operated and functioned under the corporate charter secured in 1890. At the time the new charter was issued there was no change of domicile, capitalization, officers, directors, stockholders, assets, or name, nor of business meth-

ods or practices. The assets and liabilities remained on the books of the new corporation at the same figure as they appeared on the books of the old. The new corporation issued its capital stock of the par value of $200,000 and assumed all of the liabilities of the old corporation in exchange for all of the assets of the latter, which had a value of $157,665.94 more than the amount at which they were entered on the books. The Commissioner there contended that there was no essential difference between the petitioner and the old corporation, and that, looking through form to substance, the petitioner there had had a continuing existence since 1890, and that therefore it could not write up its invested capital to correspond with the increased value of its assets. In denying this contention and holding for the petitioner, we said in part:

In our opinion, the petitioner is a new entity, separate and distinct from the old corporation * * *. It was undoubtedly organized for the purpose of continuing under corporate form the business theretofore carried on by the old corporation. But the purpose in the minds of the incorporators can in no way diminish the power and authority of the State of Illinois to grant a new charter and by the granting thereof to create a *new* corporation. We are here dealing, not with the renewal of an old charter, but the granting of a new one; not with the extension of the life of an old corporation, but with the creation of a new corporate life. * * * This identity of stockholders might affect the situation if this case came under the provisions of section 331 of the Revenue Act of 1918, but as that section has no bearing upon corporate organizations prior to March 3, 1917, it does not apply here.

In the instant case we are of the opinion that in substance as well as form the Keweenaw Land Association, Ltd., was a new entity, separate and distinct from the Keweenaw Association, Ltd. There is no provision in the revenue laws that would require us to disregard the separateness of the two entities as is sometimes the case in reorganizations, as has already been pointed out, where the new entity is created on or after March 3, 1917. Since the Keweenaw Land Association, Ltd., was created long before 1917, we are bound to regard it in the light of what it actually is, and, when so regarded, we can not escape the conclusion that under the laws of Michigan it was in every respect a new and distinct legal entity.

It follows, therefore, that, in determining what portion of the $17,076,008.22 March 1, 1913, value of depletable properties represents an "increase in value of property accrued, before March 1, 1913", we must look to the "value" of the properties when acquired by the new association in 1908 rather than the cost when acquired by the old association prior thereto. Unfortunately, the record does not show what the value of the depletable properties was in 1908. The nominal price of $40,000 stated in the October 12, 1908, resolutions of both associations is clearly no indication of the value of the depletable properties at that time. We do not understand the peti-

'tioners to so contend. Their main contention, as previously stated, is that the new association is merely a continuation of the old, with all the consequences which follow, which contention we have denied. Ordinarily where a sale is made at arm's length by persons familiar with the property involved, the price paid establishes the value of the property at that time. This was not such an arm's length trans· action. The members of both associations were identically the same persons, with each person having identically the same interests in both associations. They were interested only in having the properties of the old association transferred to the new so that the business could go on uninterrupted after 1911 the date when the old association was to cease by operation of law. They were not interested in establishing a value for the properties at that time. One dollar would have served the purpose as well as $40,000. The balance sheet of the new association as of April 1, 1909 (Exhibit 4 of the stipulation of facts) shows net assets of $171,469.31, exclusive of any value whatever for real estate, timber, and ores, which are listed among the assets as follows: "404,979 acres (estimated) of timber lands, farming and mineral lands, including 28 iron mines, Value not estimated." It is therefore plain that the $40,000 recited in the resolution as having been paid by the new association to the old association for its property does not in any sense represent the true value of the property at that time.

The evidence does show, however, that of the March 1, 1913, value of the ore content of $12,385,808.22, $4,412,000 thereof represented the discovery of new mines by the Keweenaw Land Association, Ltd., between the date of acquisition in 1908 and March 1, 1913. Since the mines were not known to exist in 1908, but were discovered between 1908 and March 1, 1913, we think that at least $4,412,000 of the total March 1, 1913, value of depletable properties of $17,076,-008.22 represents an "increase in value of property accrued· before March 1, 1913" as that phrase is used in the above quoted statute. The balance of the March 1, 1913, value, in the absence of proof, must for the purposes of this proceeding be regarded as cost or paid-in surplus of the association at the time of its organization, and any distribution from a depletion reserve based upon cost or paid-in surplus must be regarded as "other distributions from capital" as that phrase is used in section 115 (d), *supra*. We, therefore, hold that 4,412,000/17,076,008.22 (25.837 percent) of the distribution of $225,694.35, or $58,312.65, was distributed from an "increase in value of property accrued before March 1, 1913" and is "exempt from tax" under section 115 (b), *supra*; and that 12,664,008.22/17,076,008.22 (74.163 percent) of the distribution of $225,694.35, or $167,381.70 represents "other distributions from capital" as that phrase is used in

section 115 (d), *supra*. This holding makes it necessary to consider next petitioners' alternative propositions.

Although prior to December 31, 1926, the total distributions paid to petitioners, on the 8,886 shares purchased in 1915, out of depletion reserves up to that time more than equaled the total cost of the 8,886 shares, $1,003,890, and on December 31, 1928, the total distributions paid to petitioners on the 114 shares purchased in 1923 lacked only $967.37 of equaling the cost of the 114 shares, $14,025, petitioners' first alternative contention is that their total basis of $1,017,-915 can be reduced only by the distributions out of depletion reserves that were made during the effective period of the Revenue Act of 1928. In support of this contention petitioners point out that in section 115 (d) Congress referred only to the "basis of the stock provided in section 113" and that there is nothing in section 113 providing for an adjusted basis such as is provided for in section 111 (b). Petitioners argue that section 111 deals exclusively with the determination of gain or loss on the sale or disposition of property and does not deal with the taxability of distributions made by a corporation to its stockholders, which is specifically dealt with by section 115; that while section 111 also refers to section 113, it goes further than section 115 (d), and, by the express provisions of section 111 (b) (3), modifies section 113; that this difference in the applicable basis as set out in section 115 (d), and as set out in section 111, was later recognized by Congress in the Revenue Act of 1934, wherein Congress in section 115 (d) provided that other distributions from capital shall be applied against and reduce the "adjusted basis" of the stock provided in section 113; and that in applying the Revenue Act of 1928 to the facts in the instant proceeding we can not read into the act something that is not there.

We are not convinced by this argument. It is a long established rule that the intention of the lawmaker is to be deduced from a view of every material part of the statute. *Hellmich* v. *Hellman*, 276 U. S. 233; *Kohlsaat* v. *Murphy*, 96 U. S. 153, 159; *United States* v. *Fisher*, 2 Cranch, (6 U. S.) 358, 386. In the latter case Chief Justice Marshall said: "It is undoubtedly a well-established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole." It is our opinion that in applying section 115 (d) to the facts in this proceeding, the term "basis" must be construed in the light of the entire statute, and, when so construed, it must be adjusted as Congress has provided in section 111 (b) (3).

Congress has provided in section 111 (b) (3) that the "basis shall be diminished by the amount of distributions previously made in respect of such stock, to the extent provided under the law applicable

to the year in which the distribution was made." Petitioners have received distributions in every year from 1915 to 1929, inclusive. The law applicable to these years embraces every revenue act enacted since the Sixteenth Amendment to and including the Revenue Act of 1928. To what extent do the several statutes require the basis to be diminished by distributions made in respect of petitioners' interests or shares in Keweenaw Land Association, Ltd.? The Revenue Acts of 1924, 1926, and 1928 all require the basis to be diminished by distributions both from "increase in value of property accrued before March 1, 1913" and "other distributions from capital." Sec. 201 (b), (d), Revenue Acts of 1924 and 1926; sec. 115 (b), (d), Revenue Act of 1928. It follows that on January 1, 1929, the beginning of petitioners' taxable year in question, petitioners' cost basis of $1,017,915 must be diminished by *at least* the total distributions of $938,623.05 paid from depletion reserves for the years 1924 to 1928, inclusive, thus leaving on January 1, 1929, a tentative adjusted basis remaining of $79,291.95. We shall now consider to what extent the Acts of 1913, 1916, 1917, 1918, and 1921 require the basis to be diminished by distributions made in respect of petitioners' shares. The pertinent section of the Revenue Act of 1921 is section 201, the material parts of which are printed in the margin.[2]

Petitioners in their brief, after quoting section 201 (c) (printed in footnote No. 2, *supra*), argue that "It is obvious that section 201 (c) has application only in case of a sale or other disposition of stock and has no bearing upon the taxability or nontaxability of distributions of dividends, whether or not they exceed the basis of the stock." We do not agree with this statement. That is the same argument petitioners made in contending that section 111 (b) (3) of the Revenue Act of 1928 could not be applied so as to reduce petitioners' "basis" referred to in section 115 (d) of that act. We have already considered and denied that argument. We are of the opinion that section 111 (b) (3) of the Revenue Act of 1928 requires the basis to be dimin-

---

[2](b) For the purposes of this Act every distribution is made out of earnings or profits, and from the most recently accumulated earnings or profits, to the extent of such earnings or profits accumulated since February 28, 1913; but any earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, may be distributed exempt from the tax, after the earnings and profits accumulated since February 28, 1913, have been distributed. If any such tax-free distribution has been made the distributee shall not be allowed as a deduction from gross income any loss sustained from the sale or other disposition of his stock or shares unless, and then only to the extent that, the basis provided in section 202 exceeds the sum of (1) the amount realized from the sale or other disposition of such stock or shares, and (2) the aggregate amount of such distributions received by him thereon.

(c) Any distribution (whether in cash or other property) made by a corporation to its shareholders or members otherwise than out of (1) earnings or profits accumulated since February 28, 1913, or (2) earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, shall be applied against and reduce the basis provided in section 202 for the purpose of ascertaining the gain derived or the loss sustained from the sale or other disposition of the stock or shares by the distributee.

ished by the distributions made during the years 1921, 1922, and 1923, the effective period of the Revenue Act of 1921, to the extent provided under that act, and that under section 201 (b) thereof the basis is to be diminished by tax-free distributions only where the distributee is claiming a loss, and that under section 201 (c) the basis is to be diminished by other distributions from capital regardless of whether a loss or gain is involved. See Paul & Mertens, vol. 2, sec. 18.191. Since in the instant proceeding petitioners are not claiming any loss, we hold that the basis should not be reduced by distributions from "increase in value of property accrued before March 1, 1913" made during the effective period of the Revenue Act of 1921, but only by other distributions from capital made during that period.

The Acts of 1913, 1916, 1917, and 1918 do not require the basis to be diminished by distributions made in respect of petitioners' shares. Cf. *Caroline S. McLean*, 4 B. T. A. 487. We hold, therefore, that petitioners' basis should not be reduced by distributions made while those acts were in force.

The record, however, does not show the amounts of the distributions made from depletion reserves during the years 1921, 1922, and 1923 on the 8,886 shares purchased in 1915. Regarding the 114 shares purchased in 1923, the record does show that $11,889.23 was distributed from depletion reserves during the years 1924 to 1928, inclusive, and that, after applying all the distributions made on such shares from February 9, 1923, to December 31, 1928, inclusive, against the total cost of $14,025, there was a remaining cost of $967.37. Therefore, we find that from February 9 to December 31, 1923, petitioners received distributions of $1,168.40 from depletion reserves on the 114 shares, $866.52 (74.163 percent of $1,168.40) of which represented "other distributions from capital." It follows that petitioners' cost of the 114 shares, $14,025, should be reduced by $12,755.75 ($866.52 plus $11,889.23), thus leaving a remaining cost basis of the 114 shares on January 1, 1929, of $1,269.25.

As shown in our findings, there was paid to petitioners from depletion reserves on the 114 shares during 1929 the amount of $2,858.80. Of this amount, 25.837 percent or $738.63 represents a distribution from "increase in value of property accrued before March 1, 1913" and is exempt from tax under section 115 (b) of the Revenue Act of 1928. This amount, however, must be applied against and reduce petitioners' remaining basis of $1,269.25 to the amount of $530.62. Of the amount of $2,858.80, 74.163 percent or $2,120.17 represents "other distributions from capital" and, under section 115 (d) of the Revenue Act of 1928, must be applied against the remaining basis of $530.62 and the excess of $1,589.55 taxed in the same manner as gains from the sale or exchange of property.

Regarding the distributions made from depletion reserves on the 8,886 shares during the years 1921, 1922, and 1923, we are, of course, able to determine from the record that at least $91,072.61 ($1,168.40 divided by 114 equals $10.249 per share times 8,886) was so distributed from February 9 to December 31, 1923. Of the $91,072.61, $67,542.18 (74.163 percent) represented "other distributions from capital." Reducing petitioners' cost of the 8,886 shares, $1,003,890, by the amount of $67,542.18 and by all the distributions made from depletion reserves on the 8,886 shares during the years 1924 to 1928, inclusive, or $926,733.82, would leave a remaining cost of the 8,886 shares on January 1, 1929, of $9,614. But this cost would have to be further reduced by "other distributions from capital" made from depletion reserves during the period from January 1, 1921, to February 9, 1923, and the record is silent as to the amount of such distributions. This lack of proof, however, becomes immaterial, for whether we apply the total distributions paid from depletion reserves during the taxable year on the 8,886 shares, or $222,835.55, against the basis as adjusted under section 111 (b) (3), or $9,614, or a lesser amount, the excess over such adjusted basis would in either event be greater than $165,261.53 (74.163 percent of $222,835.55), the maximum amount that can be taxed under section 115 (d) of the Revenue Act of 1928.

Petitioners' tax liability for the year 1929 should be recomputed by including in capital net gain the amount of $166,851.08 ($165,261.53 plus $1,589.55) instead of the amount of $225,683.86 included by the respondent in his determination.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

VAN FOSSAN and LEECH, dissenting: Petitioners contend that their basis for the stock on which the disputed distributions in 1929 were made, is cost, diminished only by distributions from depletion reserves, occurring within the period during which the Revenue Act of 1928 was effective. We agree.

Section 115 (d) of the Revenue Act of 1928 admittedly controls the treatment of these distributions. That section provides clearly that, in computing the taxable gain therefrom "such distribution[s] shall be applied against and reduce the basis of the stock provided in *section 113*." (Emphasis supplied.) Section 113 says just as clearly that, here, such basis "shall be the cost" of the stock. Section 111, the provisions of which the majority applies, is not mentioned in section 115 (d). Not only that, but section 111, by its terms, is restricted in its application to sales or other dispositions, neither of which occurred here.

Therefore, there is no sound reason for this Board to disregard the explicit and unambiguous provisions of sections 115 (d) and 113. *Koshland* v. *Helvering*, 298 U. S. 441; *Helvering* v. *St. Louis Southwestern Railway Co.*, 84 Fed. (2d) 857; *Helvering* v. *Owens*, 95 Fed. (2d) 318. Particularly is this true in view of the history of the treatment such distributions were given in the revenue acts both before and since that of 1921.