THE KORFUND COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 110007. Promulgated May 27, 1943.

*Joseph A. Fagnant* (an officer), for the petitioner.
*B. W. Berg, Esq.*, for the respondent.

## OPINION.

DISNEY, *Judge:* In his determination of the deficiency the respondent held that the allowance of $2,786.67 to Stoessel and $3,293.33 to Zorn, which amounts include the proportionate share of each in the interest of $80, constituted income from sources within the United States on which petitioner, as withholding agent, should have paid a tax equal to 10 percent of the former amount and 15 percent of the latter amount in accordance with the provisions of sections 143 and 144 of the Revenue Act of 1938. The item of $2,786.67 includes the principal sum of $2,227.60 representing Stoessel's share of petitioner's old surplus of $24,910.40. Respondent admits that, of the total amount paid to Stoessel in 1938, $2,227.60 represented the dividend and the remainder compensation under the contract. The parties differ only on whether this item of $2,227.60 was received by Stoessel in the taxable year. The contention of petitioner is that it was distributed and taxable to Stoessel in 1928, not, as respondent determined, in 1938, when the amount, less withholding tax, was actually paid.

Petitioner does not contend that the dividend was actually paid to Stoessel in 1928. Its position is, however, that the amount was constructively received by him in that year and then loaned to petitioner.

The mere declaration of a dividend does not give rise to taxable income. There must be not only a declaration of a dividend but the setting aside of funds for its payment. *Hadley* v. *Commissioner*, 36 Fed. (2d) 543.

There was no setting aside of funds here for payment of the dividend. The aggregate amount of $8,000 paid to the old stockholders in 1929 was charged to the surplus account. In 1930 the original surplus, less $1,000 transferred to capital stock for an unexplained reason, was set up in a "Special Surplus" account. The amount is not listed as a liability in the closing balance sheet included in petitioner's return for 1928 and the accounts of the stockholders were not credited with the surplus in 1928. Such credits were not made until installments were paid. This treatment of the transaction on the books is opposed to the idea of a distribution in 1928 coupled with a loan to petitioner. There is some testimony in the record that the stockholders considered the question of lending the surplus to petitioner. If such was ever their intention, it was not proposed to petitioner. The agree-

ment among the stockholders and the resolution of petitioner contain nothing to indicate that a loan was intended. On the contrary, they clearly show intent not to withdraw the surplus for a period of four years without mutual consent of the stockholders. The agreement of the stockholders provides for withdrawal of surplus, not payment of loans. Furthermore, the evidence does not show, and petitioner makes no contention, that any of the stockholders reported their proportionate part of the surplus as income in 1928 from dividends, or otherwise.

The dividend was not at any time in 1928 subject to the unqualified demand of the stockholders. Aside from no setting aside of funds for payment of the dividend or crediting of the dividend to accounts of the stockholders, as already shown, the stockholders as directors (three of the four being present at the directors' meeting) specifically provided against making the dividend subject to their demands except by mutual consent. Thus Stoessel could not have obtained any part of his share of the surplus without unanimous consent of the other stockholders. Obviously this restriction was not imposed by Stoessel himself and he alone was never in a position to alter the situation so as to make withdrawals. On the contrary, after the refusal of petitioner to make further payments to him, Stoessel resorted to litigation to recover his share of the surplus. The record also shows that, notwithstanding the resolution accepting the offer of the stockholders, petitioner exercised control over the amount. One of the stockholders, Hoevel, received his final payment in 1931; petitioner agreed in 1934 to pay Stoessel, and in 1935 paid the other two stockholders. It has not been shown that any of this action was taken with the common consent of the stockholders concerned.

We hold that the item of $2,227.60 was not paid to Stoessel, actually or constructively, until the taxable year.

Under their contracts Zorn and Stoessel agreed, in general, to act as consultants to petitioner. In addition Zorn agreed not to compete with petitioner or give any information for the formation of a competitive company and Stoessel agreed not to act as consultant to a competitor of petitioner. All of the amount paid to Zorn and the amount paid to Stoessel in excess of the surplus item were paid for these two general classifications of undertakings without any segregation of the amount paid for each. The respondent subjected the entire amounts to withholding tax, presumably in the absence of any basis of segregation, for he does not contend that the income from services performed as consultants is subject to the tax. Not only was no evidence offered on which to make an apportionment, but petitioner does not, upon brief, suggest or request an allocation. Under the

circumstances, no apportionment is possible and we will regard all of the amounts in question under this point as having been earned by the nonresident aliens for obligations under the contracts other than service as consultants. See *Estate of Alexander Marton*, 47 B. T. A. 184.

The sole point of difference between the parties as to this income is whether it was earned from sources within the United States within the meaning of section 119 of the Revenue Act of 1938, and that, as already indicated, turns upon the source of the income derived from agreements not to compete with petitioner in the United States and Canada or give advice for the organization of, or to, a competitor.

The petitioner's contention is based upon the theory that the income was paid for agreements to refrain from doing specific things—negative acts. No defaults occurred and during the period of compliance the promisors were residents of Germany. Petitioner's contention is that negative performance is based upon a continuous exercise of will, which has its source at the place of location of the individual, and that, as the mental exertion involved herein occurred in Germany, the source of the income was in that country, not in the United States where the promise was given. The respondent's view of the question is, in short, that, as the place of performance would be in the United States if Zorn and Stoessel had violated their contractual obligations, abstinence of performance occurs in the same place. Petitioner relies upon *Piedras Negras Broadcasting Co.*, 43 B. T. A. 297; affd., 127 Fed. (2d) 260.

In the *Piedras Negras Broadcasting Co.* case the taxpayer, a Mexican corporation, owned and operated a radio broadcasting station in Mexico, from which it broadcast programs primarily for listeners in the United States, for which it received compensation in the United States from citizens thereof. In holding that the source of such income was not within the United States, we pointed out that the studio and broadcasting plant were located, and operated by the employment of capital and labor, in Mexico; that the source of the income was, accordingly, in such studio and power plant, and that the reception of the radio impulses in receiving sets in this country was secondary, not the primary source. The court in affirming the decision said that "the source of income is the situs of the income-producing service" and that the source of the income was "the act of transmission." This reasoning is said to be equally applicable to the situation here.

In *Sabatini v. Commissioner*, 98 Fed. (2d) 753, the taxpayer was an author and a subject of Great Britain. He was not in the United States before, nor during, the taxable years. By contract executed

outside the United States he gave to a publisher in this country, among other rights, the right to publish certain books, as to some of which copyrights were not obtainable. As to these the taxpayer, by the contract above mentioned, agreed not to authorize any other publisher to publish the books in the United States so long as the *publisher* left in print its editions of the books. The taxpayer was to receive under the contracts amounts determinable from the number of volumes sold. In holding that the income paid based upon the sale of these books was derived by the taxpayer from sources within the United States, the court said:

> The payments were received in consideration of his granting the publisher the exclusive right to publish here. To be sure, that may not have been of great value but the parties did value it and the author received the payments as agreed. We are not now concerned with the quality of the consideration he gave but only with the taxability of that which he received. The payments were made to him for foregoing his right to authorize others for a time to publish the works here. Though others may, perhaps, lawfully have published them they could not do so under his express authority. The rights he granted were an interest in property in the United States, in the one instance the statutory copyrights obtainable and in the other the exclusive right to publish with his permission.

In *Ingram* v. *Bowers*, 47 Fed. (2d) 925; affd., 57 Fed. (2d) 65, Enrico Caruso, a nonresident alien, entered into a contract in the United States to sing for the Victor Talking Machine Co. for the purpose of making phonograph records of selections rendered by him. The agreement contained a provision that Caruso would not permit any records of his voice to be made by any other concern. He was to receive under the contract a specified amount of the selling price of records sold, with a minimum yearly payment. In holding that the income received by Caruso under the contract from foreign sales constituted income from sources within the United States, the court pointed out that the decisive feature was the fact that the services were rendered in the United States and that those services were the source of all income derived from the contracts. No point appears to have been made of the fact that some part of the income was paid for the promise to refrain from singing for others, as it is not discussed in the opinion. Under petitioner's theory here, such part would not have been taxable.

In *Commissioner* v. *Ferro-Enamel Corporation*, 134 Fed. (2d) 564 (Apr. 7, 1943), the taxpayer agreed to purchase the entire output of the mines of a Canadian corporation for a period of three years and as a part of the contract purchased shares of the corporation's stock, for the sole purpose of obtaining raw material for its domestic business. Later in the year the corporation went out of existence and its

stock became worthless. In holding that the loss occurred in Canada, the court said:

The statute in question undertakes to classify the sources of income within the United States and without the United States by the nature and location of the activities of the taxpayer or his property which produces the income. * * *
* * * The loss grows out of an activity or use of property and the situs of the loss is not transferred to the home of respondent because respondent wished to obtain a source of raw material.

We think the question here is governed by the principles laid down in the *Sabatini, Ingram* and *Ferro-Enamel Corporation* cases. Zorn had a right to compete with petitioner in the United States and Canada and for that purpose to form a competitive company or to assist others in forming one. Likewise, Stoessel had a right to serve other corporations or individuals in the United States engaged in a business similar to petitioner's as a consultant and to furnish them information of value to their business. They were willing to and did give up these rights in this country for a limited time for a consideration payable in the United States, just as did Sabatini in "foregoing his right to authorize others for a time to publish the works here." The Circuit Court in that case calls the exclusive right to publish an interest in property in the United States; so here, in our opinion, the rights of Stoessel and Zorn to do business in this country, in competition with the petitioner, were interests in property in this country. They might have received amounts here for services or information, but were willing to forego that right and possibility for a limited period for a consideration. What they received was in lieu of what they might have received. The situs of the right was in the United States, not elsewhere, and the income that flowed from the privileges was necessarily earned and produced here. Petitioner is merely using it, so to speak, for a specified time, subject to periodical payments to the owners of the rights. Upon the termination of the contracts the rights reverted to Zorn and Stoessel, and they were then free to exercise them independent of the agreements entered into with petitioner. These rights were property of value and the income in question was derived from the use thereof in the United States.

The *Piedras Negras Broadcasting Co.* case is distinguishable. It involved employment of capital and labor in a foreign country in connection with the rendition of service—not the foregoing, for a consideration, of a right to transact business in the United States.

We find and hold that the source of all of the income in question was in the United States and is subject to withholding tax in the taxable year. Accordingly,

*Decision will be entered for the respondent.*