*Decision will be entered under Rule 50.*

FRELBRO CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65552. Filed August 18, 1961.

*J. Sterling Halstead, Esq.*, for the petitioner.
*Paul D. Barker, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in income tax for the calendar year 1952 in the amount of $1,473.04 and a personal holding company surtax, under section 500,[1] of $24,462.07. By amended answer he seeks to increase both amounts.

The issues presented for our determination are:

(1) What was the amount of the payment to petitioner in 1952 from

---

[1] Unless otherwise noted, all Code references are to the Internal Revenue Code of 1939.

Brown-Longyear Motors and what portion of it was a dividend to petitioner in that year?

(2) Whether Brown-Longyear had a credit balance in its earnings and profits account at the end of 1951 so as to constitute the above distribution a dividend;

(3) In any event, whether the dividend was required to be eliminated as an intercompany transaction;

(4) Whether petitioner, in its consolidated return for 1952, is entitled to a net operating loss deduction by virtue of the net operating loss incurred by its former subsidiary in the period immediately after petitioner and its subsidiary ceased to be affiliated corporations;

(5) Whether petitioner, in the determination of its liability for 1952, is entitled to credit for the tax paid by its former subsidiary subsequent to the affiliation on the latter's return for the full calendar year 1952;

(6) Dependent on the above issues, whether petitioner was a personal holding company in 1952.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioner is a corporation, organized under the laws of the State of New York in 1931. It maintains its principal office in White Plains, New York. Its principal business activity is the holding of real estate for investment purposes. Its other activities are more fully described below. At all times, including 1952, it has kept its books and records on an accrual, calendar year basis and has so filed its Federal income tax returns. It filed such returns with the director of internal revenue for the fourteenth district of New York.

Prior to 1929, Fred L. Brown, as sole proprietor, had been operating agencies for the sale of Buick and Chevrolet automobiles. John K. Longyear had been working for him since February 1920. In 1929 the Buick franchise was incorporated under the name of Brown-Buick Corporation and in 1930 the Chevrolet franchise was separately incorporated under the name of Brown-Chevrolet Corporation (hereinafter referred to as Buick and Chevrolet, respectively). On December 31, 1941, these two corporations were consolidated, pursuant to the New York Stock Corporation Law, into Brown Buick-Chevrolet Corporation. When the two franchises were lost in 1944 the corporate name was changed to Brown-Longyear Corporation, hereinafter referred to as B-L, which name was retained through 1952. At all times material herein, prior to July 15, 1952, B-L's 310 outstanding shares were all held by petitioner.

Fred L. Brown died in April 1944 and Longyear assumed most of the management duties although at this time he had no ownership interest in the corporation.

In April 1945, however, Longyear entered into a management agreement with B–L under which he was to receive 50 percent of that corporation's net profits. At the same time petitioner granted him an option to purchase 51 percent of the B–L stock (158.1 shares) for $42,500.

When B–L declared a dividend it would charge its "earned surplus" account for the amount thereof and make a corresponding credit to an intercompany account with petitioner. This was a running account reflecting various transactions (including dividends) between B–L and petitioner. There was no practice to clear its balance periodically, said balance merely being altered as one party or the other made payments on account. Likewise, there was no policy to make cash transfers simultaneous with or corresponding to dividend declarations. B–L simply made cash transfers when and as warranted by its financial position. Thus, the account on B–L books reflected the following transactions from the start of 1949 to the end of 1951:

| Date | | Debit* | Credit* | Credit balance | Discharged by transaction | | "Dividends" owing (balance) | Other credits (balance) |
|---|---|---|---|---|---|---|---|---|
| | | | | | Dividends | Other credits | | |
| 1/1/49 | Opening balance | | | $10,613.46 | | | | $10,613.46 |
| Through 2/18/49 | Other debits | $537.96 | | 10,075.50 | | $537.96 | | 10,075.50 |
| 3/28/49 | Dividend | | $45,437.48 | 55,512 98 | | | $45,437.48 | 10,075.50 |
| 3/31/49 | Cash to petitioner | a10,075.50 | | 45,437.48 | | 10,075.50 | 45,437.48 | 0.00 |
| 1949 | Other debits | 1,362.16 | | 44,075.32 | $1,362.16 | | 44,075.32 | 0.00 |
| 1949 | Other credits † | | 2,025.00 | | | | | |
| | Taxes** | | 4,726.43 | 50,826.75 | | | 44,075.32 | 6,751.43 |
| Prior to 6/19/50 | Rents | | 1,500.00 | 52,326.75 | | | 44,075.32 | 8,251.43 |
| 6/19/50 | Dividend | | 24,449.86 | 76,776.61 | | | 68,525.18 | 8,251.43 |
| 1950 | Payments to or for petitioner. | 51,790.24 | | 24,986.37 | 44,075.32 | 7,714.92 | 24,449.86 | 536.51 |
| 1950 | ⎧Rents | | 2,100.00 | | | | | |
| | ⎨Taxes | | 5,454.61 | | | | | |
| | ⎩Other debits | 2,010.95 | | 30,530.03 | 1,474.44 | 536.51 | 22,975.42 | 7,554.61 |
| Prior to 5/31/51 | Other credits † | | 1,500.00 | 32,030.03 | | | 22,975.42 | 9,054.61 |
| 5/31/51 | Dividends | | 19,890.69 | 51,920.72 | | | 42,866.11 | 9,054.61 |
| 8/14/51 | Paid to petitioner | 7,000.00 | | 44,920.72 | 7,000.00 | | 35,866.11 | 9,054.61 |
| 1951 | Other debits | 1,550.38 | | 43,370.34 | 1,550.38 | | 34,315.73 | 9,054.61 |
| 1951 | Other credits † | | 6,858.12 | 50,228.46 | | | 34,315.73 | 15,912.73 |

*Debit entry represents amount applied against balance owing to petitioner; Credit represents increase in amount owing to petitioner.
**B–L's share of Federal income taxes paid by petitioner.
a Discharges all of pre-1949 balance.
† Nondividend items.

On May 28, 1952, at a combined meeting of the directors and stockholders of B–L a dividend of $19,598.22 was declared.

On July 8, 1952, at a special meeting of petitioner, it was agreed that the sum of $52,213.91 be paid to B–L as "capital surplus." At a meeting of B–L's stockholders and directors held later the same evening—the identical parties being present—a dividend of $11,771.88 was declared (bringing declared dividends for 1952 to $31,370.10) and it was agreed that B–L issue a note to petitioner for $20,000 in part payment of the dividends declared. Said note was issued on July 8, 1952.

At about the same time, Longyear announced his intention to exercise his option. A meeting of petitioner, with its attorneys and accountants, was held and Longyear did exercise the option on the understanding that B–L would not pay cash on account of its dividend obligations until warranted by its working capital position, there being a present need for ready cash to meet inventory requirements. Longyear exercised the option on July 15, 1952, and on July 17, 1952, a share certificate was issued to him.

On October 31, 1952, "In accord with resolution adopted at Special meeting held 7/8/52" petitioner issued its check to B–L in the amount of $52,213.91. B–L treated this as a donation to its surplus and did not give petitioner credit for this amount in its intercompany account. On the same date B–L issued checks to petitioner as follows:

(1) $50,228.46 in payment of "balance due 1/1/52"; and
(2) $11,370.10 which together with the $20,000 note paid off the 1952 dividend declaration of $31,370.10.

At the time B–L drew these latter two checks, taking into account the donation by petitioner on the same date, B–L had sufficient amounts on deposit to cover these two checks and still meet its immediate requirement for working funds of about $50,000.

On December 31, 1941, when the predecessor to B–L was formed, the "earned surplus" [2] accounts of the two corporations consolidated showed the following balances:

|  | Chevrolet | Buick |  |
|---|---|---|---|
| Debit balance from operating losses since inception (net of operations) | ($27, 727. 91) | ($67, 754. 18) |  |
| Total debit | | | ($95, 482. 09) |
| Credits: | | | |
| Cancellation of preferred stock | 35, 000. 00 | 75, 000. 00 | |
| Cancellation of liability to shareholder | 6, 184. 46 | 18, 582. 13 | |
| Asset writeups | 3, 120. 32 | 7, 602. 11 | |
| Total credits | 44, 304. 78 | 101, 184. 24 | |
| Credit balance | 16, 576. 87 | 33, 430. 06 | |

On December 31, 1951, apart from these balances of Chevrolet and Buick, B–L on its own had accumulated earnings from operations of $83,612.56 (actual earnings less dividends paid out).

Brown Buick-Chevrolet, for the years 1942 and 1943, and B–L (its successor), for the years 1944–1946, filed separate corporation income tax returns. For the years 1947–1951, inclusive, petitioner filed a consolidated corporation income tax return treating B–L as an affiliate and including in the returns the results of B–L's operations. In 1952

---

[2] This account included all forms of "surplus"; the reference does not mean that the account is identical to "Earnings and Profits" for Federal income tax purposes.

petitioner filed a separate return and B–L did likewise. The 1952 net income of B–L for the period of its affiliation with petitioner (up to July 15, 1952) was (taking into account uncontested adjustments) $6,987.61. For the period subsequent to affiliation (July 15 to December 31, 1952) B–L sustained a net operating loss of $4,994.90 giving net income for entire 1952 of $1,992.71, which amount it reported in its separate 1952 return. B–L paid taxes of $815.87 on its 1952 return.

In 1952 petitioner derived income from real estate holdings in addition to earnings through its ownership of stock in B–L. Its gross income, apart from earnings on or sales of B–L stock was: Rents, $17,685; interest, $941.67; long-term capital gain from sale of real estate, $12,480.84.

At all times during 1952 petitioner's outstanding capital stock was all owned by three persons.

#### ULTIMATE FINDING.

Petitioner had dividend income from B–L in 1952 of $45,685.83 and was a personal holding company for that year.

#### OPINION.

### Issue 1. Amount of Dividend in 1952.

#### a. Amount of Cash Transferred.

Petitioner describes the above-mentioned October 31, 1952, transactions as "an exchange of checks" in which petitioner realized a dividend of only $9,384.65 (the difference between the two checks it received totaling $61,598.56 and the check it issued for $52,213.91). We cannot subscribe to this version of the facts. The check from petitioner to B–L was treated by all parties concerned as a donation to the capital (i.e., "donated" or "capital" surplus) of the latter and the books of both clearly reflect this treatment. It is difficult to conjure up a reason for the meeting of petitioner's principals with its attendant decision and the issuance of petitioner's check if all that the parties sought to accomplish was a transfer of $9,384.65. The credit balance in the intercompany account on B–L's books was reduced by $61,598.56 as a result of these transactions and this is the amount of obligation owing to petitioner which B–L must be deemed to have discharged on October 31. We can perceive no reason for treating these carefully planned transactions entered into on advice of petitioner's attorneys and accountants after consultation, as something different from what the contemporaneous documents show them to be. Cf. *John Hamilton Perkins*, 36 T.C. 313 (1961). Even were we to accept petitioner's argument that "the transaction was just a very awkward and ill-advised method of transferring earnings of

Brown-Longyear to its [donated] surplus account," we would nevertheless be compelled to conclude that petitioner had received $61,598.56 and then returned $52,213.91 of it to B–L.[3]

It is true that but for petitioner's check to B–L, B–L would not have had sufficient cash in its bank accounts to cover its two checks to petitioner. This circumstance is of some evidentiary significance in support of petitioner's position that the full amount of the checks to it was greater than the actual cash transferred to it. However, it does not alter our appraisal of the event as deliberately arranged by the parties. Furthermore, it is always possible that B–L could have borrowed funds with which to clear the balance owing to petitioner. See *A. D. Saenger, Inc.* v. *Commissioner*, 84 F. 2d 23, 25 (C.A. 5, 1936), affirming 33 B.T.A. 135 (1935), certiorari denied 299 U.S. 577. Certainly the condition of its cash account does not per se render the payment of a cash dividend impossible. *A. D. Saenger, Inc.* v. *Commissioner, supra.*

*Estate of Joseph Nitto*, 13 T.C. 858, 867 (1949), relied upon by petitioner, is not authority to the contrary. There, no cash was transferred in the earlier year (when the low cash balance existed). We held that a cash dividend had not been paid to the taxpayer in the earlier year, relying upon the presumptive correctness of respondent's determination and petitioner's failure of proof in rejecting petitioner's argument that the dividend became income in the earlier year.

We thus hold that B–L transferred $61,598.56 in cash to petitioner in 1952.

### b. *Amount of Dividend Included in Cash Transfer.*

In determining what portion of this cash represented a payment of dividends owing to petitioner, respondent employed what may be described as a Fifo method and we have incorporated such method into our findings. That is, we have proceeded on the assumption that the $50,228.46 credit balance in the intercompany account on B–L's books at the end of 1951 consisted of the most recent credits to that account and that prior credits had been discharged in order by earlier debits. This is exactly in accord with the intercompany account between petitioner and B–L as reflected on B–L's books at December 31, 1951. It shows dividends-owing balance of $34,315.73 to which we add dividends of $19,598.22 and $11,771.88 declared May 28 and July 8, 1952. This total of $65,685.83 is then reduced by B–L's note for $20,000 issued July 8, 1952, and accepted in part payment (but not paid in 1952). The balance owing is thus $45,685.83.

Also, where parties fail to specify which of several items in an open account have been satisfied by particular payments, the application of

---

[3] We are not called upon to decide the effect of such capital contributions upon the basis of petitioner's Brown-Longyear stock.

such payments will be determined by applicable State law. *Lincoln Storage Warehouses*, 13 T.C. 33 (1949), affd. 189 F. 2d 337 (C.A. 3, 1950).

Under the law of New York which is here applicable, it is well settled that where there are long running accounts with debits and credits perpetually occurring, payments are to be applied, absent an understanding to the contrary, to extinguish debits according to priority of time. *Foss* v. *Riordan*, 84 N.Y.S. 2d 224, 233-236 (1947), affd. 79 N.Y.S. 2d 515 (1948), appeal dismissed 80 N.E. 2d 658 (1948). This rule is generally accepted everywhere. *Lincoln Storage Warehouses, supra.* It is justified not only because it protects those debts which are least secure but also because it is most in accord with business realities. *Lincoln Storage Warehouses* v. *Commissioner*, 189 F. 2d 337, 342.

Accordingly, we hold that $45,685.83 of the 1952 payment of $61,598.56 to petitioner was on account of dividends owed to it.

Petitioner claims that in using the above-described method of matching debts and payments respondent erred in that he assumed that liability for Federal income taxes occurred at the end of each calendar year whereas it really accrues ratably throughout the tax year. If this be an error, its correction would assist rather than impair respondent's position for it would accrue taxes earlier and thereby decrease the amount paid on account of dividends each year.

c. *Proper Year of Inclusion of Dividend.*

Respondent concedes that the $20,000 note did not represent dividend income in 1952 but contends that the $45,685.83 was includible in 1952 to petitioner, an accrual basis taxpayer. An accrual basis taxpayer must include dividends in income in the year in which they are made unqualifiedly subject to his demand, i.e., the time when payment is to be made. *Tar Products Corporation* v. *Commissioner*, 130 F. 2d 866 (C.A. 3, 1942), reversing *Falmouth Co.*, 45 B.T.A. 1033 (1941); *American Light & Traction Co.*, 3 T.C. 1048 (1944), affd. 156 F. 2d 398 (C.A. 7, 1946). In this latter case, we acquiesced in the Third Circuit's reversal of our decision in *Falmouth*. Reviewing the instant record, we have found that it was B–L's policy to make cash payments only when *it* felt that *its* cash position warranted them and we can therefore conclude that prior to October 31, 1952, payment was subject to B–L's judgment and that the funds were thus not unqualifiedly subject to the demand of petitioner, a separate though related entity. Cf. *Emery Kinkead, Inc.*, 35 T.C. 152, and *Basil F. Basila*, 36 T.C. 111 (1961).

Our holding is also in line with decisions denying an accrual when there are practical or legal restrictions upon withdrawal by the shareholder. *Korfund Co.*, 1 T.C. 1180 (1943); *Basil F. Basila, supra.*

*A. D. Saenger, Inc.* v. *Commissioner*, 84 F. 2d 23 (C.A. 5, 1936), and *Roe* v. *Commissioner*, 192 F. 2d 398 (C.A. 5, 1951), relied on by petitioner, are distinguishable because there the shareholders treated the bookkeeping credit as creating an account against which they could draw. We thus hold that the dividends were properly accruable only in 1952 when actually paid.

## Issue 2. Earnings and Profits Account.

We are called upon to decide whether the negative (debit) balances in the earnings and profits accounts of Buick and Chevrolet of $67,754.18 and $27,727.91, respectively,[4] entitle the consolidated corporation, Brown Buick-Chevrolet Corporation (now B–L, after the reorganization), to carry over a deficit of $95,482.09. If we permit the carryover, the deficit may absorb $95,482.09 of postconsolidation earnings before a credit balance arises in B–L's earnings and profits account, with the result that only to the extent of 1952 earnings of B–L ($1,992.71) would petitioner realize a dividend under section 115.[5]

The landmark decision in *Commissioner* v. *Sansome*, 60 F. 2d 931 (C.A. 2, 1932), reversing 22 B.T.A. 1171 (1931) (but since followed numerous times by us), certiorari denied 287 U.S. 667, required a taxpayer-successor in a statutory reorganization to carry over the credit balance in the earnings and profits account of its predecessor. While some had thought this decision to be based upon the theory of "continuity of venture" (see, e.g., *Munter* v. *Commissioner*, 157 F. 2d 132 (C.A. 3, 1946), reversing 5 T.C. 108, revd. 331 U.S. 210 (1947); dissenting opinion in *Helen V. Crocker*, 29 B.T.A. 773 (1934); contra, *Putnam* v. *United States*, 149 F. 2d 721 (C.A. 1, 1945)), later judicial explanation teaches us that the real *ratio decidendi* of *Sansome* is that a reorganization may not be used to erase accumulated earnings so as to permit tax-free a distribution which would have been, but for such reorganization, a dividend. *Commissioner* v. *Munter*, 331 U.S. 210; *Commissioner* v. *Phipps*, 336 U.S. 410 (1949), reversing *Margaret R. Phipps*, 8 T.C. 190, and *Commissioner* v. *Phipps*, 167 F. 2d 117 (C.A. 10, 1948).

---

[4] These are the figures as set forth in our findings unadjusted for the cancellation of stock or debt or for asset writeups. In view of our decision on this issue, we need not pass upon respondent's argument that, apart from the stock cancellation, these other adjustments require a reduction in the amount of these accumulated deficits.

[5] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *

Considering this now-accepted meaning of *Sansome* it would seem difficult to perceive any reason for allowing deficits to carry over, for this would go beyond *Sansome's* purpose and, in effect, as the Supreme Court pointed out in *Phipps*, permit a parent to "declare a deficit" even though, under the reorganization provisions, no loss was to be recognized. Furthermore, it would expand *Sansome* beyond its requirements by sanctioning a deviation from normal accounting procedure not required by the *Sansome* rationale. See *Putnam v. United States, supra;* Atlas, "The Case of the Disappearing Earnings and Profits," 7th Ann. N.Y.U. Tax Inst. 1155 (1949).

The *Phipps* case specifically held that a parent corporation could not reduce its own credit balance in earnings and profits by the amount of accumulated deficits of four of the five subsidiaries which it had liquidated tax-free. The Court reasoned, applying the *Sansome* rule, that a distribution which would be a taxable dividend absent a reorganization (or liquidation) should not lose its character as such merely because there had been a reorganization. The Court further pointed out that simply because accumulated earnings were carried over in a tax-free reorganization it did not follow that deficits were to be similarly treated. The carryovers of the two types of balances are not corollary propositions. The carryover of earnings was rather an application of the purpose behind the *Sansome* rule. The carryover of deficits, on the other hand, was not required to effectuate this purpose. Such "carryover" would seem to be justified only to the extent that the new entity and the old one were identical or at least operated the same business. See *Libson Shops, Inc. v. Koehler*, 353 U.S. 382 (1957), and cf. *Kolker Bros., Inc.*, 35 T.C. 299; *Marr v. United States*, 268 U.S. 536 (1925).

Petitioner argues, however, that the *Phipps* case is inapplicable because here neither of the corporations at the time of the reorganization had any accumulated earnings. Petitioner then relies on *Harter v. Helvering*, 79 F. 2d 12 (C.A. 2, 1935), for the proposition that as a general rule deficits of party corporations do survive a reorganization. It is open to serious doubt whether *Harter* stands for any such proposition, for, on its facts, *Harter* simply involved the question whether the subsidiary had any earnings and profits (to be carried over under *Sansome*) at the time it was liquidated by its parent, the parent having a small accumulated deficit. As the court found that the subsidiary, in fact, had no balance in its earnings and profits account, the statement that the parent's deficit survived was purely gratuitous. See Huxman, *J.*, dissenting in *Commissioner v. Phipps, supra* at 121. (The majority opinion in the Tenth Circuit was reversed by the Supreme Court.)

In any event, if *Harter* is authority for any proposition here relevant, it at most holds that a deficit of a corporation which *survives* the

reorganization (or liquidation) remains. This was the perhaps too charitable view which the Supreme Court in the *Phipps* decision took of *Harter*. The wisdom of such a holding seems rather dubious for it places such emphasis on the direction of the reorganization. See 5 Tax L. Rev. 523, 533 (1950). Thus, the *Harter* and *Phipps* decisions may be considered irreconcilable; if and to the extent that they are, then *Harter* must fall and the authority of the Supreme Court decision in *Phipps* must prevail. (The *Harter* decision has been adversely criticized as leaving open a way for tax avoidance. See 48 Col. L. Rev. 281.)

In *United States* v. *Snider*, 224 F. 2d 165 (C.A. 1, 1955), a Massachusetts trust (T) owned hotels B and K. T transferred hotel B to newly formed B corporation for the latter's shares; T then formed corporation K, the holders of T shares surrendering their shares for K shares. K then liquidated T and thus became the owner of hotel K and the B shares. The court held that T's deficit was available to K to offset its earnings subsequent to its formation. The decision is justified to the same extent as *Harter*, i.e., the corporation (K) making use of the deficit embraced no more or less than did T; no new operations or assets were added.

Without passing upon the correctness of *Snider*, we note that the court there interpreted *Sansome* as adopting a general rule *permitting* earnings and deficits to carry over on the "continuity of venture" theory and considered *Phipps* as merely a special limited exception to that rule. However, as we construe the *Phipps* decision it holds that the general rule prohibits the carryover of any item unless the special circumstances of *Sansome* are present and require a carryover of accumulated earnings.

It is to be noted that where the question of carryover of a balance in earnings and profits for purposes other than determining whether there has been a dividend under section 115 was involved, even the credit balance does not carry over, *Stratton Grain Company* v. *Reisimer*, 272 F. 2d 864 (C.A. 7, 1959) (holding that no predecessor earnings and profits were to be included in the earnings and profits account of the plaintiff-successor, and consequently that no subtraction was required under section 718(b)(3) to arrive at equity invested capital under section 718(a)).

In *Snider*, the court assumes that the sole reason for the *Phipps* holding was that one of the parties to the reorganization had a credit balance in earnings and profits. Petitioner stresses the same point here. However, the *Phipps* decision is not so narrow and we feel that a combination of deficits of parent and subsidiary is likewise forbidden by the reasoning of the Supreme Court.

Following petitioner's position to its logical conclusion would result in an inconsistency demonstrated by the following hypotheticals:

1. E corporation has a $1 credit balance and D has a $1 million debit balance in their respective earnings and profits accounts. In a tax-free reorganization the two are consolidated to form F and (under the *Phipps* doctrine) F acquires a $1 credit balance in its earnings and profits.

2. Same facts except that E has a $1 deficit in earnings and profits. F acquires $1,000,001 debit in its earnings and profits.

What petitioner overlooks is that the evil which the Court was meeting in the *Phipps* case is still present if corporations are permitted to "pool" deficits and use them interchangeably. See *Libson Shops, Inc* v. *Koehler*, *supra*.

A recent District Court decision, *Kavanagh* v. *United States*, 187 F. Supp. 430 (D. Neb. 1960), appears to hold that combined existing deficits of several corporations survive a reorganization in which a new corporation is formed. From the facts found by that court we cannot determine whether the deficit existed in the account of more than one of the corporations. If it did, we must respectfully disagree with the decision. If it did not, and if the *postreorganization earnings were attributable to the operations of the deficit corporation*, the case is no different than *Snider* and the above comments and criticisms made on that case are appropriate here.

In both *Snider* and *Kavanagh* the courts thought it unfair to "penalize" the taxpayer by depriving him of the benefit of accumulated deficits. To this point, we can only answer that the "penalty" is no greater than that suffered by the taxpayer in *Phipps*. We further note as did the court in *Phipps* that the statute is designed to prevent recognition of any loss (which may well be entirely unrelated to the accumulated deficit—see footnote 15 of *Phipps*, 336 U.S. at 421) until the taxpayer is completely divested of his interest in the entire venture and that prior to this time there is no method by which a taxpayer can "realize" the potential loss for there is no way to "declare a deficit," *Commissioner* v. *Phipps*, *supra* at 420.

Accordingly, we hold that there was no accumulated deficit carried over to Brown Buick-Chevrolet's earnings and profits account and that B–L's earnings and profits on December 31, 1951, were $83,612.56 (credit) and therefore, under section 115(a)(1), the distributions of $45,685.83 were taxable dividends.

## Issue 3. Elimination of Intercompany Dividends.

Respondent argues that petitioner should have filed a consolidated return for 1952 and there included not only its income for the full calendar year but also the income of B–L for the period from January 1 to July 15, 1952. B–L should then have filed a separate return for the period July 16—December 31, 1952. We are in complete

agreement, Regs. 129, sec. 24.13,[6] and petitioner does not contend otherwise. In determining such income of petitioner, respondent relies on his regulations [7] which require elimination of intercompany items such as the dividends here if includible in income *prior* to the termination of the affiliation.[8] However, it is quite clear that income properly includible by one of the previous affiliates in a period subsequent to cessation of the affiliation may not be eliminated under these regulations. *Beneficial Corporation,* 18 T.C. 396 (1952), affirmed per curiam 202 F. 2d 150 (C.A. 3, 1953). The dividends here became income to petitioner on October 31, 1952 (when petitioner and B–L were no longer affiliated), and thus derive no benefit from the regulations and must be included as income on the 1952 return.

### *Issue 4. Net Operating Loss Carryback.*

Under the regulations above cited [9] B–L was required to file a separate return for the period from July 16, 1952, to the end of the year. Such return would show a net loss of $4,994.90. Petitioner maintains that it may carry back such loss as a deduction on the consolidated return. To the extent of the 1952 income attributable to B–L during

---

[6] The pertinent parts of this section provide:

(c) *Complete termination of affiliated group prior to close of taxable year.* If an affiliated group is terminated prior to the close of the taxable year of the group, the consolidated return must include the income of the common parent corporation for its entire taxable year * * * and of each subsidiary for the period prior to the termination * * *.

\* \* \* \* \* \* \*

(g) *Separate returns for periods not included in consolidated return.* * * * If a corporation ceases to be a member of the affiliated group during the taxable year of the group, its income for the period after the time when it ceased to be a member of the group must be included in a separate return * * *

[7] Section 24.31(b), Regs. 129, provides:

(b) *Computations.* In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in these regulations—

(1) *Net income.* The net income of each corporation shall be computed in accordance with the provisions covering the determination of net income of separate corporations, except—

(i) There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another member of the group (referred to in these regulations as intercompany transactions) ;

\* \* \* \* \* \* \*

(2) *Other computations on separate basis.* The various other computations required by these regulations to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions as if a separate return were to be filed, but with the following exceptions:

(i) *Net income.* The net income used in any such computation shall be the net income of the corporation determined in accordance with the provisions of this section.

(ii) *Dividends received.* In the computation of the dividends received, there shall be excluded all dividends received from other members of the affiliated group.

[8] Petitioner does not question that the affiliation terminated on July 15, 1952. Section 24.11(d), Regs. 129, provides:

(d) *When affiliated group terminates.* For the purpose of these regulations, an affiliated group shall be considered as terminated if the common parent corporation ceases to be the common parent or if there is no subsidiary affiliated with it.

[9] See footnote 6, *supra.*

the affiliation (which is here sufficient to absorb the entire loss), we hold that petitioner is correct under both respondent's own regulations [10] and the cases: *Hennessy Realty Company*, 26 B.T.A. 196 (1932); *Riley Stoker Corporation*, 26 B.T.A. 749 (1932); *American Trans-Ocean N. Corp.* v. *Commissioner*, 229 F. 2d 97 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court. This holding does no violence to the long-established principle that affiliated corporations, although permitted to file consolidated returns, are separate entities for the purpose of net operating loss deductions. *Woolford Realty Co.* v. *Rose*, 286 U.S. 319 (1932) (disallowing carry-forward of preaffiliation loss of one affiliate on consolidated return where said affiliate had a loss in year of consolidated return); *Olivier Company* v. *Patterson*, 151 F. Supp. 709 (N.D. Ala. 1957) (same); *Trinco Industries, Inc.*, 22 T.C. 959 (1954) (disallowing carryback of entire consolidated loss to offset preaffiliation profit of one of the affiliates). In all these cases the effort was to carry the loss (backward or forward) to a different taxable entity while here the entity sustaining the loss is identical with the one which reported a profit during the consolidated return period. See *Riley Stoker Corporation*, *supra*.

### Issue 5. Credit for Taxes Paid by Subsidiary.

B–L's separate return for the full calendar year 1952 included the period prior to July 15, 1952 (for which period a consolidated return should have been filed under section 24.11(a), Regs. 129). The $815.87 tax paid with the separate return was all attributable to income earned during the affiliation (B–L having operated at a loss subsequent to termination of the affiliation). Thus under respondent's

---

[10] Section 24.31, Regs. 129, provides:

(a) *Definitions*—

 \* \* \* \* \* \*

(2) *Consolidated net operating loss deduction.* The consolidated net operating loss deduction shall be an amount equal to the aggregate of the consolidated net operating loss carry-overs and of the consolidated net operating loss carry-back to the taxable year \* \* \*.

 \* \* \* \* \* \*

(4) *Consolidated net operating loss carry-back.* The consolidated net operating loss carry-back to the taxable year shall consist of—

 (i) \* \* \*.

and, with respect to a net operating loss sustained by a corporation which, for the succeeding taxable year, files a separate return \* \* \* subject to the limitations prescribed in section 24.31(b)(3),

 (ii) The amount of the net operating loss, if any, of such corporation for the succeeding taxable year.

 \* \* \* \* \* \*

(b) *Computations.* \* \* \*

 \* \* \* \* \* \*

(3) *Limitations on net operating loss carry-overs and carry-backs from separate return years.* In no case shall there be included in the consolidated net operating loss deduction for the taxable year \* \* \* as a consolidated net operating loss carry-back under (a)(4)(ii) of this section \* \* \* an amount exceeding in the aggregate the net income of such corporation \* \* \*

own regulations [11] we feel it is clear that petitioner is entitled to a credit of $815.87 against its own tax liability for 1952. The soundness of this result becomes apparent when we consider that under the regulations here discussed it was petitioner (parent) who was ultimately liable for the tax with respect to the subsidiary's earnings during the period when a consolidated return was mandatory. It makes no difference that as between parent and subsidiary, the subsidiary was regularly reimbursing the parent for its proportionate share of the Federal income tax. In 1952 this reimbursement was effected by a direct payment to respondent's office rather than through a bookkeeping credit to petitioner (parent). Thus it is clear that section 24.11(b) of Regulations 129 is applicable in this case. Such credit should be given effect under the Rule 50 computation.

### Issue 6. Personal Holding Company Surtax.

Respondent maintains that petitioner was a personal holding company in 1952 and thus liable for the surtax penalty under sections 500–502.[12] The only point of contention between the parties on this issue is whether petitioner had the requisite 80 percent personal holding company income under section 502 in that year. With our decision under the foregoing issues the solution to this question becomes a simple matter of arithmetic. Adding the $45,685.83 dividends to the $31,107.51 other gross income, there is total gross income of $76,793.34. Since rents are but $17,685, they are less than 50 percent of gross income and, hence, under section 502(g) they are personal

---

[11] Section 24.11(b), Regs. 129, provides:

(b) *Effect of separate returns when consolidated return is required.* If the making of a consolidated return is required for any taxable year, the tax liability of the members of the affiliated group shall be computed in the same manner as if a consolidated return had been made, even though separate returns are made; amounts assessed upon the basis of separate returns shall be considered as having been assessed upon the basis of a consolidated return; and amounts paid upon the basis of separate returns shall be considered as having been paid by the common parent corporation. * * *

[12] SEC. 500. SURTAX ON PERSONAL HOLDING COMPANIES.

There shall be levied, collected, and paid, for each taxable year beginning after December 31, 1938, upon the undistributed subchapter A net income of every personal holding company (in addition to the taxes imposed by chapter 1) a surtax equal to the sum of the following:

(1) 75 per centum of the amount thereof not in excess of $2,000; plus

(2) 85 per centum of the amount thereof in excess of $2,000.

SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; * * *.

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of:

(a) Dividends, interest * * *.

*     *     *     *     *     *     *

(g) RENTS.—Rents, unless constituting 50 per centum or more of the gross income.
* * *

holding company income. Thus, personal holding company income is: Dividends $45,685.83, interest $941.67, rents $17,685, totaling $64,312.50 which is greater than 80 percent of gross income. Accordingly, petitioner was a personal holding company under section 501(a).

*Decision will be entered under Rule 50.*